[Crim. Nos. 19839, 19650. Second Dist., Div. Two. Sept. 28, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD L. MILLER, Defendant and Appellant.

## COUNSEL

Marvin Jabin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Joyce L. Kennard, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THE COURT.\***—In two unpublished opinions, 2 Crim. No. 19839 and 2 Crim. No. 19650, filed April 4, 1972[1] and April 20, 1972,[2] this court affirmed the conviction of defendant of kidnaping and burglary in one case, and two counts of first degree robbery in the other. The Supreme Court of California unanimously denied a hearing in each case.[3]

The kidnaping and burglary involved the vicious taking of a 10-year-old child from his home. The child was blindfolded, tied up, imprisoned and terrorized for three days. The child was recovered after the father paid a $250,000 ransom, which has never been recovered in whole or part from defendant.

The robbery charges involved armed robberies of a theater and a market in Alhambra on September 3, 1968, and September 29, 1969, respectively. These robberies netted an aggregate of approximately $16,000.

Overwhelming evidence established that defendant master-minded and participated in these crimes with one Gene Patterson, an ex-felon. Defendant at the time of the crimes was, and for some years prior thereto, in the employ of the Internal Revenue Service (IRS) of the United States as a special agent.

---

\*Before Roth, P. J., Compton, J., and Beach, J.

[1]Case No. 19650—opinion authored by Justice Fleming and concurred in by Presiding Justice Roth and Justice Herndon.

[2]Case No. 19839—opinion authored by Presiding Justice Roth and concurred in by Justices Herndon and Fleming.

[3]The California Supreme Court at that time was composed of the following jurists: Chief Justice Wright and Justices McComb, Peters, Tobriner, Mosk, Burke and Sullivan.

On February 1, 1978, we recalled the remittiturs in these above numbered cases and reinstated the appeal to permit consideration of an issue not raised in the previous appeals, to wit, the validity of two search warrants which resulted in the seizure of certain evidence used against defendant at the trials.

Our recall of the remittiturs was compelled by an order directed to this court for the outright release of this dangerous criminal issued by the federal district court for the Central District of California unless this court would reinstate within 60 days said previous appeals for the consideration of the issue stated.[4]

The order of the federal district court followed the recommendation of a federal *magistrate,* which recommendation was based upon the finding of that magistrate that defendant had been "ineffectively" represented by counsel[5] in his appeals before this court because said counsel had failed to raise the issue of the search warrants.

We pause here to point out that prior to defendant's successful ploy by petition for habeas corpus in the federal district court, he had *unsuccessfully* on *three* several occasions *sought the same relief* on the same grounds by petition for a writ of habeas corpus in the Superior Court of San Joaquin County, the California Court of Appeal for the Third Appellate District and the Supreme Court of California.

What has happened here then is that a judicial officer at the level of *magistrate* has, with the concurrence of two *trial level* judges of the federal judicial system, reviewed and discovered an "alleged" error of constitutional dimensions in the hearing of defendant's appeal before this appellate court.

We consider the order by the federal district court to be an affront to the judges of the courts of this state. We preferred, however, to suffer the affront rather than permit a convicted felon to go free with the apparent possibility of benefiting from the use of his ill-gotten gains.

[4]Defendant petitioned the federal district court for writs of habeas corpus in December of 1974, and the petitions were granted on November 30, 1977 and January 9, 1978.

[5]In his former appeals defendant was represented by Messrs. Donald Roeschke and Albert Silverman, both of whom are well known to this court. We consider them to be highly competent with special expertise in the criminal law and appellate procedure.

This situation, with which this court is now confronted, is a good example of why the criminal justice system is so often criticized for failing to achieve certainty and finality in its judgments. It is also an unfounded attack on the highly competent counsel who formerly represented defendant and who are characterized by the *magistrate* as "ineffective" and approaches the high water mark of the too frequent examples of overreaching on the part of the federal trial courts in state court litigation.

The present situation has been summarized by George Cochran Doub, former Assistant Attorney General of the United States, in an article entitled *The Case Against Modern Federal Habeas Corpus* (1971) 57 A.B.A. J. 323 at page 326: "Conviction in the state courts now has become merely the starting point of interminable litigation. State appeals are followed by successive petitions for federal habeas corpus and successive federal appeals. What is involved is a repetitious, indefinite, costly process of judicial screening, rescreening, sifting, examining and re-examining of state criminal judgments for possible constitutional error. . . . No other nation in the world has so little confidence in its judicial systems as to tolerate these collateral attacks on criminal court judgments. . . . This comparatively new concept of federal habeas corpus has dangerously prejudiced the delicate balance of federal-state relations and has seriously degraded the authority of the states and their judicial tribunals."

■ Our rereview of the record imposed upon us to determine the validity of the issue raised by the magistrate leads to the conclusion that the magistrate's finding is totally lacking in merit. ■ Although our Supreme Court requires effective representation by defense counsel and obligates the court itself to make certain such representation has been provided, it is clear that effective representation by counsel on appeal does not require the presentation or discussion by defense counsel or the reviewing court of patently frivolous issues. (See *In re Smith,* 3 Cal.3d 192, 203 [90 Cal.Rptr. 1, 474 P.2d 969].)

■ The record, as we will show, demonstrates that the issue raised by the habeas corpus ploy in the federal court is frivolous and defendant's counsel on appeal were quite correct in not burdening this court with arguments directed to an analysis thereof which we are now compelled to make.

In the trial of the cases, the above mentioned Patterson testified for the prosecution concerning the defendant's participation in the various

crimes. On appeal counsel understandably raised numerous contentions focusing primarily on the insufficiency of the corroboration of the accomplice's testimony and the jury instructions concerning that issue.

This court found, in each case, substantial corroboration in the testimony of other witnesses who identified defendant or testified to conduct and statements by him. Because we found adequate corroboration without reliance on the seized material, our detailing of the evidence in that regard made no reference to any evidence taken in the searches which are now under attack.

Defendant now contends that two search warrants—one issued by a state court magistrate and one by a federal magistrate (not the magistrate involved in the habeas corpus proceedings) were improper and that evidence seized by virtue of their use was damaging to his case and that it corroborated the accomplice.

That evidence, according to defendant, consisted in the main of a briefcase containing facial makeup, security guard uniforms and badges, false mustaches and scars and other disguise paraphernalia, hand guns and a fictitious license plate, all taken from an automobile used by the defendant and an apartment that he maintained in Van Nuys.

Significantly, defendant, in his attack on the search warrants, does not challenge the sufficiency of the supporting affidavits in establishing probable cause to believe that defendant had committed a series of serious crimes involving the use of guns, disguises and the fictitious license plate. Defendant's sole contention is that at the time the warrants were issued there was no reason to believe he still had these items or that he kept them in the place where they were found.

■ The affidavits must be interpreted in a common sense fashion rather than a hypertechnical one. Reasonable and logical inferences may be drawn and the magistrate may consider matters of common knowledge concerning human behavior. (*People* v. *Superior Court,* 6 Cal.3d 704 [100 Cal.Rptr. 319, 493 P.2d 1183]; *United States* v. *Ventresca,* 380 U.S. 102 [13 L.Ed.2d 684, 85 S.Ct. 741]; *United States* v. *Lucarz,* 430 F.2d 1051.)

■ Search warrants are presumptively valid, and a magistrate's action in issuing the warrants will only be set aside if the affidavits presented to him, as a matter of law, show a lack of sufficient probable cause. (*People*

v. *Aguilar,* 240 Cal.App.2d 502 [49 Cal.Rptr. 584].) The preference accorded to the use of search warrants requires that we resolve all intendments in favor of upholding the decision of the two magistrates who issued the warrants, if there is any substantial basis for those decisions. (*United States* v. *Ventresca, supra*; *Skelton* v. *Superior Court,* 1 Cal.3d 144 [81 Cal.Rptr. 613, 460 P.2d 485]; *Frazzini* v. *Superior Court,* 7 Cal.App.3d 1005 [87 Cal.Rptr. 32].)

■    The question here, which was not originally decided because it was overwhelmingly rendered frivolous by the undisputed facts, is simply whether there was a substantial basis for the magistrate's conclusion that the objects sought were *probably* at the specified locations.

■    The connection between the items to be seized and the place to be searched need not rest on direct observation. It may be inferred from the type of crime involved, the nature of the item, and the normal inferences as to where a criminal might likely hide incriminating evidence. (*United States* v. *Lucarz, supra.*)

■    The first search warrant was issued on October 10, 1969. It was based on an affidavit of Officer Aharonian of the Alhambra Police Department. A common sense reading of that affidavit discloses the following facts.

Gene Patterson was arrested on September 29, 1969, as he was fleeing after committing an armed robbery of the Shopping Bag Market at 1000 East Valley Boulevard in Alhambra. In the commission of the robbery Patterson wore a uniform and badge in impersonating an armored transport guard.

Patterson told Officer Aharonian that defendant had planned the robbery and had furnished him with the gun, badge and uniform. He stated defendant was at the scene of the robbery in a 1969 dark blue Chevelle automobile and when he, Patterson, was pursued by police after the robbery defendant followed in that automobile and attempted to block a police vehicle that was in pursuit.

Officer Aharonian ascertained from the Internal Revenue Service that defendant was assigned the above mentioned car by his employer. The pursuing police officer corroborated Patterson's story. Further investigation by Officer Aharonian established the following.

In early March of 1969, a citizen reported to police in Alhambra that an individual in a white Volkswagen, bearing license number TXW 786, was observing the Shopping Bag Market at 1000 East Valley Boulevard through binoculars. The license plate belonged to a 1957 Buick, registered to a person in Oxnard. On March 15, an officer of the Alhambra Police Department saw the Volkswagen in question in the City of Alhambra and questioned the driver. The driver was the defendant who told the officer he was a government undercover agent and was using a "phony" plate in the course of his work and that he was checking on his "girlfriend" who lived in San Gabriel and who was employed at the above mentioned market.

Further investigation revealed that defendant's girl friend, one Yolanda Hanley, did in fact live in San Gabriel, and that she had been employed in at least three Shopping Bag markets, and that after each transfer the market where she previously worked had been robbed in a manner similar to that used in the September 29, 1969, robbery of the Shopping Bag Market at 1000 East Valley Boulevard.

In May of 1969, defendant, in the same Volkswagen with the same fictitious license plate, had been observed at a Shopping Bag Market in the City of Upland. When he was questioned by a police officer defendant identified himself as Ronald Lee Miller, an IRS agent. Four weeks after that, the market was held up in a similar fashion.

Surveillance of Miss Hanley's apartment in San Gabriel revealed the presence of two automobiles in the driveway. Those automobiles remained there during the night. One of the vehicles was a Volkswagen bearing the plate which, at that time, showed it to be registered to the defendant at an address in Van Nuys. Further investigation established that defendant did in fact rent an apartment in Van Nuys.

Patterson told Officer Aharonian that he and defendant had previously committed an armed robbery at the Alhambra Theater. Officer Aharonian exhibited a series of photographs to the victim of that robbery and the victim identified the defendant as one of the perpetrators.

Patterson also implicated defendant in other robberies and his information was corroborated by independent sources. Patterson told Officer Aharonian that defendant used various disguises such as false mustaches, scars and makeup which he carried in an attache case.

The search warrant of October 10, 1969, directed the search of defendant's Van Nuys apartment along with the government vehicle assigned to defendant and defendant's own Volkswagen automobile. The warrant authorized, inter alia, a search for uniforms, hand guns, disguise paraphernalia and license plate number TXW 786.

Defendant was arrested on October 10, 1969, at the federal building in Los Angeles. A search of the government vehicle conducted at the garage in the federal building immediately after defendant's arrest produced a brief case containing makeup. A search of the Van Nuys apartment produced guns, uniforms, makeup, false mustaches and the license plate number TXW 786.

One of the federal agents who participated in the search was Donald Bowler who at the time was chief of the Intelligence Division of the Internal Revenue Service. He observed the recovery of the items linking defendant to various crimes. He also discovered the presence of a number of items of stolen government property.

Subsequent investigation by Bowler and other agents of the IRS revealed that defendant had told certain agents that he had constructed a concealed compartment in the apartment and a concealed room in the garage to store illegal automatic weapons. Defendant had exhibited to one of the IRS agents parts for the construction of a silencer and automatic weapons.

On the basis of the aggregate of the prior information and this additional information as set forth in an affidavit by Bowler, a United States magistrate, on October 15, 1969, issued a search warrant for an additional search of defendant's apartment. Apparently evidence was seized at that time which was also used at the trial of the cases now before us.

Defendant in his brief deals at length with the so-called "two prong" test of *Aguilar* v. *Texas,* 378 U.S. 108 [12 L.Ed.2d 723, 84 S.Ct. 1509], and its California progeny as epitomized by *People* v. *Hamilton,* 71 Cal.2d 176 [77 Cal.Rptr. 785, 454 P.2d 681]. Those cases deal with the issue of the sufficiency of an informant's information. This approach to this case is misdirected.

There is no question but what the "informant," Patterson, who was defendant's accomplice in the crimes, spoke in factual rather than

conclusionary language and that he spoke with personal knowledge of the matters he related. (*People* v. *Hamilton, supra.*) Further, the additional corroborative evidence, which an independent investigation produced, established Patterson's credibility and the reasonableness of the officer's reliance on what Patterson told him. As noted, defendant does not challenge that aspect of the affidavits.

It is clear to us that neither Officer Aharonian in his affidavit nor Agent Bowler in his affidavit, nor the magistrates in issuing the two warrants, were relying on Patterson's information in determining the probability of just where the evidentiary material would be located at that time.

Patterson simply told Officer Aharonian that defendant carried his disguise material in an attache case and he described in detail defendant's modus operandi in using the various items in the commission of the crimes. The information concerning the concealed compartment and room and the illegal firearms came from defendant's own mouth in speaking to government agents.

From the evidence presented to the magistrate who issued the first warrant, it was clearly established that defendant had been engaged in a continuing and ongoing crime spree involving the use of the fictitious license plate, guns and various items of disguise. It could further be inferred with unassailable logic that as of September 29, 1969, the date of defendant's latest criminal act, and as of October 10, 1969, some 11 days later, he still possessed the accouterments of his vocation.

Proceeding from this reasonable conclusion, the magistrate's further conclusion that those items would probably be found in either of the two cars used by defendant or the apartment which he apparently maintained alone, had a substantial basis in fact.

A number of California cases have recognized that from the nature of the crimes and the items sought, a magistrate can reasonably conclude that a suspect's residence is a logical place to look for specific incriminating items. (See *People* v. *Stout,* 66 Cal.2d 184 [57 Cal.Rptr. 152, 424 P.2d 704]; *People* v. *Lundy,* 2 Cal.App.3d 939 [82 Cal.Rptr. 815]; *People* v. *Johnson,* 21 Cal.App.3d 235 [98 Cal.Rptr. 393].) In this case the government car used by defendant in his participation in the robbery of September 29, 1969, was an equally logical place to look for incriminating evidence.

The foregoing discussion also serves to dispose of defendant's contention that Agent Bowler's affidavit was insufficient to support the federal magistrate's conclusion that the illegal firearms would be found at the apartment. What more logical inference could be drawn from defendant's own statements that he possessed illegal firearms and that he had constructed special hiding places for them?

The judgments are affirmed.

Appellant's petition for a hearing by the Supreme Court was denied December 6, 1978.