RONALD L. MILLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 3750-71.
United States Tax Court
T.C. Memo 1981-249; 1981 Tax Ct. Memo LEXIS 493; 41 T.C.M. (CCH) 1548; T.C.M. (RIA) 81249; May 21, 1981. Ronald L. Miller, pro se. Edgar Gonzalo Rios, for the respondent. RAUM
MEMORANDUM OPINION RAUM, Judge: The Commissioner determined the following deficiencies and additions to tax in respect of petitioner's 1967, 1968 and 1969 income taxes: Additions to Tax,
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1967
$ 155,712.08
$ 7,785.60
1968
1,622.29
81.11
1969
2,061.26
103.06
The principal matter requiring decision is whether petitioner received unreported income from kidnapping and other crimes. The case was submitted on the basis of a stipulation of facts. At the time of the filing of his petition herein, petitioner was a resident of the California State Prison in Tracy, Cal. However, by the time this case was set for trial, petitioner had been released on *494 parole. From August 1964 through October 10 of 1969, petitioner was employed as a Special Agent with the Intelligence Division of the Internal Revenue Service. As a Special Agent, petitioner's duties included the investigation and assistance in the prosecution of criminal violations of the Internal Revenue Code. Some time after midnight on April 3, 1967, Kenneth Jon Young, who was then ten years of age, was kidnapped from his family home in Beverly Hills, California. According to Kenneth, a man took him out of his bed, tied his hands, and blindfolded him. He hit Kenneth over the head when Kenneth started to scream. The man said, "shut up or I will kill you" and told Kenneth he wanted to steal some money from Kenneth's father. The man put Kenneth on the floor of a car parked in the driveway and drove toward Sunset Boulevard. The man told Kenneth he could get killed for this. The man drove for 20 minutes and then carried Kenneth up some stairs to a room and closed the door. At approximately 8:00 a.m. on April 3, 1967, Arline Young, Kenneth's mother, discovered that Kenneth was missing. She found an envelope on Kenneth's bed marked "IMPORTANT. Do not call the police. Give *495 this letter to the master of the house at once". She gave the envelope to her husband, Herbert Young, Kenneth's father, who subsequently found a letter inside the envelope. The letter warned Mr. Young not to call the police, or his "missing merchandise" would be "vindictively destroyed". The letter further demanded payment of $ 250,000, and warned that Mr. Young would "never see this merchandise again" if he refused to pay. Following directions in the ransom letter, on April 5, 1967, Herbert Young took $ 250,000 in $ 100 dollar bills in an overnight bag to a service station in Westwood, Cal. At approximately 6:00 p.m. he received a call at the station instructing him to drive to a service station in Brentwood. At the Brentwood service station a man in a white 1965 Chevrolet Impala motioned Young to follow him. Young followed the man to Sepuvelda Boulevard near the San Diego freeway, where the man took the money and said Young's son would be returned later that evening. According to Herbert Young, the man to whom he gave the money was the same size as petitioner; there was a strong similarity between the man's walk and petitioner's walk; he had the same shape head, nose, mouth, *496 jaw, and chin line as petitioner; and his voice sounded like petitioner's voice. Young also thought that the man's hair might be artificial. Kenneth was held captive for approximately three days. Kenneth Young testified (presumably at the criminal trial, hereinafter referred to) that he believed there were two men involved in the crime, as the hair and height of the man who actually kidnapped him were not the same as the man who stayed with him at the apartment. At approximately 9:00 p.m. on April 5, 1967, Kenneth was given some sleeping pills by the kidnapper. He awoke about 3:00 a.m. in a car parked in garage at an apartment house in Santa Monica. Kenneth went to the nearest apartment, called his father, and shortly thereafter was reunited with his family. The $ 250,000 which Herbert Young delivered to the kidnapper has never been recovered. In in indictment returned by the Grand Jury of Los Angeles County, on March 31, 1970, petitioner was charged in Count I with burglary in that on or about April 3, 1967, he "did willfully, unlawfully and feloniously enter the dwelling house and building occupied by Herbert Young and Kenneth Young, in the City of Beverly Hills, * * *497 * with the intent * * * to commit Kidnaping, a felony", in violation of section 459 of the Cal. Penal Code (West 1970). In Count II of the indictment petitioner was charged with "Kidnaping For Ransom And Reward", in violation of section 209 of the Cal. Penal Code (West 1970), in that "on or about the 3rd day of April, 1967, * * * [he] did willfully, unlawfully and feloniously seize, confine, abduct, conceal, kidnap and carry away Kenneth Young, an individual, with the intent to hold and detain and did hold and detain said Kenneth Young, with intent and for the purpose of exacting from relatives and friends ransom and reward, to wit, $ 250,000". The petitioner entered a plea of not guilty to the charges set forth against him in the indictment. After a trial on the merits before a jury, on October 26, 1970, the jury found petitioner guilty of violating the provisions of section 459 and 209 of the Penal Code of California, as charged in Counts I and II of the indictment. On November 2, 1970, the Superior Court of the State of California, for the County of Los Angeles, entered its judgment in accordance with the verdict. Petitioner filed a timely notice of appeal, and his conviction *498 for kidnapping and burglary was subsequently affirmed in an unpublished opinion by the California Court of Appeal, Second Appellate District. People v. Miller, 2 Crim. No. 19650 (Cal. Ct. Appeal, filed April 4, 1972). As summarized in the stipulation of facts filed herein, the following is the principal evidence introduced by the prosecution in petitioner's criminal trial for kidnapping and burglary: (a) Gene Laverne Patterson testified that: (1) He, Patterson, met petitioner in 1963. He saw petitioner several times in 1967 while he was on a work release program from a Federal prison. After Patterson was released from prison, he continued to meet with petitioner. (2) Petitioner offered Patterson $ 100,000.00 to drive a car where he could cover him (Miller). He showed Patterson a list of names of wealthy people which included the name Young. Petitioner showed Patterson a culvert where he wanted Patterson to bring the child so that the "master of the house" could pick him up after the kidnapping. (3) Patterson was with petitioner when the latter stole automobile license plates later used in the kidnapping and was with petitioner when he stole an automobile which was *499 used in the kidnapping. At the time, petitioner told Patterson he was going to use the automobile for a kidnapping. The two men went on two overnight trips to Oakland. Petitioner drove a white 1965 Chevrolet Impala. (4) Petitioner and Patterson practiced using walkie talkies. Petitioner showed Patterson homes of wealthy people, including a house with a white brick front and a wrought-iron fence. Wearing a disguise, petitioner spent about 15 minutes out of Patterson's sight around that house. (5) On the evening of April 2, 1967 petitioner and Patterson put on disguises at petitioner's apartment and drove in two cars to Beverly Hills near Sunset Boulevard, where petitioner had shown Patterson the house with the white brick front and wrought-iron gate. Patterson waited near the corner. By walkie talkie, Patterson told petitioner that all was clear. Petitioner drove around the corner and toward Sunset Boulevard. Patterson went home. (6) Patterson went with petitioner while he abandoned the white Chevrolet Impala in the parking lot of a shopping center near the Topanga Canyon off-ramp to the Ventura freeway. The same day petitioner gave Patterson $ 1,000.00 in $ 20.00 bills. *500 (7) Later, Patterson talked with petitioner about the kidnapping. According to Patterson petitioner said he had done it, that he (petitioner) called the victim's house and gave instructions to the master of the house, that there had been some trouble at the pay-off site, but he had obtained a lot of money, and the money was in Switzerland. (b) Herbert Young testified that at the time of the kidnapping, his house had a white facade, the first floor exterior was white brick, and there was a black fence and gate. (c) Arline Young testified that on the Wednesday before Easter 1967, she saw a man who looked like petitioner walk very slowly in front of her house, look up the driveway, and then walk to his car and drive away. On March 28, 1967, she heard and saw a white Chevrolet zoom in and out of her driveway. (d) The white 1965 Chevrolet Impala used to collect the ransom money had been stolen from an automobile agency on March 27, 1967. It was found on April 10, 1967 in the Topanga Plaza parking lot. A switch to operate the tail lights had been installed under the dashboard and the interior lights had been disconnected. (e) Jerrold Kelley, a U.S. Customs Agent, testified *501 that petitioner told him his (Miller's) Internal Revenue Service car had a switch on it to disconnect the tail light, and that petitioner said that he had learned to disconnect the inside lights of an automobile to avoid attention during surveillance work. (f) Dirt and animal hair were found in the Impala. The hair was similar to that found on Kenneth's clothes and could have originated from a dog petitioner kept at his apartment. The dirt came from a culvert which Patterson testified looked like the culvert petitioner had shown him. Similar dirt was found in an Internal Revenue Service car checked out to petitioner on the 4th, 5th and 6th of April 1967. (g) Clara Kessler, petitioner's ex-wife, testified that petitioner saw Patterson three or four times while Patterson was still in federal prison. In the latter part of March of 1967, she saw in petitioner's garage a light Chevrolet which appeared to be a 1965 model. On the evening of April 2, 1967 petitioner returned from a trip to Oakland, took his brief case out of the locked closet, and told Clara that if his mother * asked about him, to tell her that he was still out on business. *502 (h) Petitioner kept make-up items in his apartment. When the police and FBI agents arrested petitioner in October, 1969, they found hair pieces, moustaches, keys, make-up, adhesive, disguises, and sun glasses in his apartment. (i) Joan Rudy testified that she overheard Patterson talking with petitioner on the telephone during the last week of March 1967. One of them said, "where are we going to keep him?". (j) Duane Thomas, a prison mate of Patterson, testified that while Patterson was on a pre-released [sic] program from Federal prison during February and March of 1967, Patterson told him that an agent had asked him to participate in a kidnapping. (k) Jerrold Kelly testified that petitioner had talked with him about what to do if he had a large amount of money and wanted to dispose of it. They discussed putting the money in Swiss banks. (l) John Truax, an FBI agent, testified that before trial, Patterson told him that petitioner had told him that he had the ransom money in Switzerland. At petitioner's criminal trial for kidnapping and robbery, the prosecuting attorney conceded during closing arguments that it was clear from the evidence produced during the trial *503 that the man who watched over Kenneth Young in the apartment during the three days he was held captive was not the petitioner. At that trial, Patterson testified that he was not the man who kidnapped Kenneth on April 3, 1967, nor the man who stayed with Kenneth during the three days he was held captive. On September 3, 1968, two men forced their way into the Alhambra Theater located at 702 West Main Street in Alhambra, California, during nonbusiness hous. They tied up the staff and a manager by the name of Stoddard Gumaer. After repeated attempts to open the theater safe with a combination coerced from Mr. Gumaer at gun point, the two men succeeded in doing so, and made good their escape with $ 5,680 of the theater's money. On October 30, 1969, an Information was filed in the Superior Court of the State of California for the County of Los Angeles, against petitioner accusing him of two counts of robbery. In Count I it was alleged that on September 3, 1968, petitioner, by means of force and fear, took "personal property from the person, possession and immediate presence of Stoddard Gumaer", in violation of section 211 of the Cal. Penal Code (West 1970). Count II likewise charged *504 petitioner with robbery. The second robbery occurred on or about Sepgember 29, 1969. Petitioner entered pleas of not guilty to the charges set forth against him in the information. After a trial on the merits before a judge, on August 6, 1970, the judge rendered a verdict finding the petitioner guilty of violating the provisions of section 211 of the Cal. Penal Code (West 1970), as charged in Counts I and II of the information. Judgment against petitioner for two counts of first degree robbery was entered on August 28, 1970, by the California Superior Court for the County of Los Angeles. Petitioner filed a timely "Notice of Appeal" from the judgment, and his conviction was affirmed by the California Court of Appeal, Second District, in an unpublished opinion. People v. Miller, 2 Crim. No. 19839 (Cal. Ct. App., filed April 20, 1972). The Supreme Court of California unanimously denied a hearing in both the 1967 kidnapping case and the 1968 robbery case. On February 1, 1978, the California Court of Appeal reinstated the appeals in both of petitioner's criminal cases to permit consideration of an issue not raised on the previous appeals, namely, the validity of two search *505 warrants which resulted in the seizure of certain evidence used against petitioner. These additional proceedings were prompted by an order of a Federal district court issued as a result of petitioner's petitions for writs of habeas corpus. In a published opinion, the California Court of Appeal again affirmed the judgments of conviction. People v. Miller, 85 Cal. App. 3d 194, 149 Cal. Rptr. 204 (1978), cert. denied 441 U.S. 925 (1979). The Commissioner determined that petitioner received $ 250,000 of ransom money in 1967 which was not reported on his 1967 income tax return. The Commissioner further determined that petitioner received $ 5,680 of additional income in 1968 "in the form of the value of items obtained by burglary" in 1968. With respect to petitioner's 1969 return, a similar determination was made, but this matter and most other disputed items for 1968 and 1969 have been disposed of by stipulation of the parties. Petitioner's 1969 income tax return claimed a deduction for $ 3,250 of legal fees; the Commissioner disallowed the deduction because the expenditure was a personal expense. The Commissioner also determined that the resulting *506 underpayments of tax in 1967, 1968, and 1969 were due to negligence or intentional disregard of rules and regulations, and accordingly asserted the addition to tax provided by section 6653(a), I.R.C. 1954, for each year. However, the Government now concedes that no addition to tax is due for 1969. In his petition filed herein, petitioner claimed that he did not commit any crimes or receive any of the proceeds thereof. In its amended answer, the Government alleged that petitioner's criminal convictions, as described above, estopped petitioner from denying that he kidnapped Kenneth Young with the intent to obtain ransom and reward and that he took personal property from Stoddard Gumaer by means of force and fear on September 3, 1968. In his reply to the Government's amended answer, petitioner continued to deny his participation in the crimes. He further claimed that his prior criminal convictions should not estop him from denying participation in the crimes, and that the prior convictions did not establish that he received any of the proceeds of the crimes. On brief petitioner further argues that the Government has the burden of proof herein because the deficiency notices were *507 "arbitrary, capricious, unreasonable and excessive". 1. Receipt of ransom and robbery proceeds. The only assignments of error made by Mr. Miller in his petition to this Court are as follows: A. The income upon which the tax deficiencies are based is alleged to have come from the commission of three separate crimes committed in the years 1967, 1968 and 1969. Petitioner claims that he did not commit these crimes, nor did he receive any proceeds from any of them, nor does he have any knowledge of who committed them. B. Petitioner was not, as alleged in the notice of deficiency, convicted of Burglary for the years 1968 and 1969, nor did he receive any income from items of value obtained by burglary. The only facts alleged by him in support of those assignments of error are as follows: A. Petitioner is innocent of the crimes for which he stands convicted. The evidence relied on as sustaining the conviction is purely circumstantial and does not support a finding of guilt beyond a reasonable doubt. B. The physical evidence used against petitioner was obtained as the result of two illegal searches in violation of the Petitioner's 5th Amendment rights to the Constitution *508 of the United States. Therefore, should a court of Appellate or higher jurisdiction decide that the physical evidence was obtained in violation of petitioner's constitutional rights, his convictions will be overturned. C. Until a final adjudication of Petitioner's guilt or innocence is decided in the highest court to which he carries his appeal, Petitioner's case should not properly be heard or decided before this Tax Court. Plainly, there is no genuine substance at this time to the main thrust of either the assignments of error or the facts alleged in support thereof. Petitioner's guilt under California law has already been adjudicated and all his persistent attempts on an appellate level to challenge the convictions have been unsuccessful. Petitioner stands finally convicted of both the 1967 kidnapping and the 1968 robbery [1] which are now in issue before us. The convictions were based upon findings of guilt beyond a reasonable doubt. Moreover, upon reexamination of the evidence, it is clear to us that such evidence (as summarized in the stipulation of facts filed herein) supports the findings of guilt. We arrive at the same conclusion reached in the criminal proceedings. *509 [2] We need not recount the details that convincingly point to petitioner's participation in the kidnapping and robbery. And there is no serious dispute on the evidence before us that ransom of $ 250,000 was paid in the 1967 kidnapping or that $ 5,680 was stolen in the 1968 robbery -- although petitioner strenuously argues on brief that these amounts should not be attributed to him in their entirety. He no longer seriously contends, as alleged in his petition, that he did not receive "any" of the ransom or stolen funds. *510 Petitioner appears to have all but abandoned the basic position set forth in his petition, and his principal present contentions as set forth in his brief, are that he "could not have acted alone in the commission of the crime", that the criminal convictions did not establish the amount of his receipts (if any) as the fruits of the crimes, that it was improper on the part of the Commissioner to determine that petitioner had received the entire amounts involved, and that the burden of proof was upon the Government to establish how much he in fact did receive, a burden which he claims the Government has failed to meet here. Although we agree that the California convictions did not establish how much, if any, of the ransom or stolen funds found their way into petitioner's hands, we reject his conclusion that the burden of proof was upon the Commissioner. That burden was upon the petitioner, and he has not presented sufficiently satisfying evidence to carry it. At the outset, we note that petitioner has raised these issues for the first time on brief, and it is well settled that unpleaded matters raised for the first time on brief will not be considered. Molbreak v. Commissioner, 61 T.C. 382, 393 (1973), *511 affd. per curiam 509 F. 2d 616 (7th Cir. 1975); Maxcy v. Commissioner, 59 T.C. 716, 728 (1973); Messer v. Commissioner, 52 T.C. 440, 455 (1969), affd. 438 F. 2d 774 (3d Cir. 1971); see Anderson v. Commissioner, 527 F. 2d 198, 199 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. In any event, petitioner's contentions are wholly without merit. Because a trial before the Tax Court is a trial de novo requiring a determination on the merits of the case rather than a review of the evidence developed at the administrative level, this Court generally "will not look behind a deficiency notice to examine the evidence used or the propriety of respondent's motives or of the administrative policy or procedure involved in making his determinations". Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974); see, e.g., Llorente v. Commissioner, 74 T.C. 260, 264 (1980), on appeal (2d Cir. Nov. 17, 1980); Human Engineering Institute v. Commissioner, 61 T.C. 61, 66 (1973). Moreover, even if we were to look behind the deficiency notice, it was plainly *512 not arbitrary on the part of the Commissioner to attribute all of the 1967 ransom or 1968 robbery proceeds to petitioner. To be sure, the record supports petitioner's contention that another person (and perhaps even a third person) may have been involved in the kidnapping and that another person was involved with him in the 1968 robbery. However, the record also makes plain that petitioner conceived, planned, directed, and was primarily responsible for the execution of the kidnapping plot. He was the mastermind as well as the dominant figure and there was also a reasonable basis for concluding that the entire $ 250,000 ransom in $ 100 bills was delivered to him. Moreover, his role in the 1968 robbery was hardly that of a minor character; he played a major part therein. The Commissioner was thus obviously justified in attributing the entire proceeds of these crimes to petitioner, for, where there are multiple participants in an income producing criminal activity, the Commissioner is entitled to determine that each participant received the entire proceeds in order to protect the revenue from inconsistent positions that might be maintained by the participants. Gerardo v. Commissioner, 552 F. 2d 549, 555-556 (3d Cir. 1977); *513 cf. Laino v. United States, 633 F. 2d 626, 632-633 (2d Cir. 1980); Avery v. Commissioner, 574 F. 2d 467, 468 (9th Cir. 1978). Petitioner's remedy is to show how much he in fact received, but he offered no such evidence. This case is wholly unlike those comparatively rare instances in which deficiency notices were considered to be arbitrary and excessive where the taxpayer was charged with the receipt of unreported income from illegal activities and the Government failed to present evidence linking the taxpayer with the criminal activities for the period covered by the deficiency notice. [3] The facts in the instant case stand in sharp contrast to those exceptional situations just described. The Commissioner's determination herein was not arbitrary within the meaning of those cases, and the customary allocations of the burden of proof in this Court remain applicable here. Rule 142(a), Tax Court Rules of Practice and Procedure. It was of course open to petitioner to show that he did not receive all of the ransom or all of the stolen funds. He offered no proof in that connection, except possibly some evidence that he gave Patterson $ 1,000 in $ 20 *514 bills. [4] Plainly, Patterson was small fry in the kidnapping enterprise, and the $ 1,000 paid to him in $ 20 bills appears to have been more in the nature of compensation rather than a sharing (by partners in the venture) of the $ 250,000 ransom which was paid in $ 100 bills. And petitioner has not presented any issue as to whether he should be allowed a deduction for that $ 1,000 payment. The taxability of the entire amount of the 1968 robbery proceeds to petitioner is more troublesome. However, *515 the evidence does show that petitioner was a principal participant in the robbery, and the burden was on him to show that he did not end up with the entire $ 5,680. There is nothing but stony silence in the record in this respect. Accordingly, since the burden was on the petitioner, we must decide against him as to this item for failure of proof. Since he failed to present any evidence in this connection, he is chargeable with receipt of the entire amount. See DeCavalcante v. Commissioner, 620 F. 2d 23, 26-27 (3d Cir. 1980); Gerardo v. Commissioner, supra, 552 F. 2d at 552-553; cf. Laino v. Commissioner, supra, 633 F. 2d at 632-633; Avery v. Commissioner, supra, 574 F. 2d at 468. 2. Deductibility of 1969 legal fee. Although petitioner claimed a deduction for a $ 3,250 legal fee purportedly paid in that year, he presented no evidence to contest the Commissioner's disallowance of this deduction. We accordingly must sustain the Commissioner's determination as to this issue. To reflect settlement of other issues, Decision will be entered under Rule 155. Footnotes
*. Petitioner's income tax returns claimed his mother as a dependent who resided with him.↩
1. Although the deficiency notice erroneously stated that petitioner was convicted of "burglary", petitioner was actually convicted of robbery, a somewhat different offense. ↩
2. In the circumstances, we do not find it necessary to pass upon the Government's contention that petitioner is collaterally estopped from attacking the verdicts in those cases, notwithstanding that there appears to be strong support for its position. Until recently, the requirement of mutuality of estoppel generally may have been regarded as precluding the Commissioner from asserting the collateral estoppel effect of state court findings of criminal culpability in subsequent Federal tax litigation because the Commissioner had not been a party to the state criminal proceedings. However, as a result of the Supreme Court's decision in Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979), it is now clear that mutuality of estoppel is no longer generally required for the application of collateral estoppel in the Federal courts. Under the Court's decision in Parklane, trial courts are given broad discretion to apply collateral estoppel absent mutuality if they determine that the party estopped was previously given a full and fair opportunity to contest the issues involved and that it would not be unfair to apply collateral estoppel in the circumstances. Parkland Hosiery Co. v. Shore, supra439 U.S. at 331 & n.16; Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 333-334, 350 (1971); see Allen v. McCurry,     U.S.    ,    , 101 S. Ct. 411, 415 (1980). There can be little doubt that the California courts afforded petitioner a full and fair opportunity to attempt to establish hs innocence of the crimes charged; indeed, the evidence indicates that petitioner vigorously asserted his innocence at both trial and appellate levels, obtaining appellate review of his convictions on three occasions and even pursuing habeas corpus relief from the Federal courts. As a criminal defendant, petitioner enjoyed significant procedural advantages not available in this Court, such as the availability of a jury trial and the requirement of proof of guilt beyond a reasonable doubt. Cf. Standefer v. United States, 447 U.S. 10, 22-24↩ (1980). In the circumstances, we would not find any unfairness in applying collateral estoppel to petitioner, but, as indicated above, we need not pass on the issue at this time.
3. See, e.g., Weimerskirch v. Commissioner, 596 F. 2d 358, 360-362 (9th Cir. 1979); Gerardo v. Commissioner, 552 F. 2d 549, 552-554 (3d Cir. 1977); Jackson v. Commissioner, 73 T.C. 394, 402-403 (1979); cf. Carson v. United States, 560 F. 2d 693, 696-698 (5th Cir. 1977); Pizzarello v. United States, 408 F. 2d 579, 583-584 (2d Cir.), cert. denied 396 U.S. 986↩ (1969). 4. There is also a tantalizing suggestion that petitioner offered Patterson $ 100,000 to drive a car where he could "cover" petitioner, but there was no evidence whatever that any such amount was ever paid to Patterson.↩