Filed 9/13/23  P. v. Alexander CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061335 |
| v. | (Super. Ct. No. 13NF1797) |
| BYRON ALEXANDER, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Julian W. Bailey, and Kimberly K. Menninger, Judges.  Affirmed in part, reversed in part, and remanded with directions.

Kendall Dawson Wasley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel, Seth Friedman and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

Byron Alexander appeals from a judgment of conviction for false imprisonment and second-degree robbery.  He challenges the denial of a pretrial motion to suppress evidence recovered from his vehicle.  He also asks this court to independently review the sealed transcript and materials concerning his *Pitchess* motion.[1]  We affirm the denial of the suppression motion because the search was reasonable under the automobile exception.  But we conclude the court's in-camera *Pitchess* hearing did not conform with prescribed procedures and thus conditionally reverse the judgment of conviction.

FACTS

On February 4, 2013, a payday-advance business in Anaheim was robbed.  Around 9:00 a.m., shortly after the manager opened the store, two men dropped from a hole in the ceiling and grabbed her.  They had on ski masks and gloves, and were dressed in all black.  They hit her repeatedly while looking for the safe.  She gave them the combination to open it, but their attempts were unsuccessful and caused the safe to go into "delay," a set time period in which it couldn't be opened.  They dragged the manager to the safe and demanded she open it.  She tried but failed because of the timed delay.  After each failed attempt, the men beat and tased her.  She suggested they take the safe with them.  One man told the other to "kill her."  Eventually the men handcuffed then pushed the manager into the bathroom, took the safe, and left.

A worker from a bakery in the same strip mall as the payday-advance business saw two masked men dressed in all black walking behind the building.  The men were struggling to carry a heavy item in a large bag.  They headed toward a parking structure and got into a black minivan.  The bakery worker saw a black man in a security-guard uniform "just observing, looking around."  This third man got into the driver's seat of the minivan and drove off.  Upon seeing the manager emerge from the store

---

[1]        *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

handcuffed, the bakery worker called 911.  He provided dispatch with an Oregon license plate number for the minivan.

That same day, a black minivan was returned to a rental car company; it had an Oregon license plate number nearly identical to the one reported by the bakery worker (two of the numbers were transposed).  According to the manager of the rental car company, the contract for the minivan listed Alexander's wife as the renter; Alexander and his wife were regular customers; Alexander was there when they took possession of the minivan; and the rental was charged to his credit card.

About two months later, Ventura County Sheriff's Deputy Jason Christmann secured a warrant to search the homes of Alexander and Davion McDaughtery and any vehicles "parked at or in the vicinity of the residence[s]."  In his affidavit, Deputy Christmann declared the men were suspects in three robberies of check cashing stores in which the robbers entered through the ceiling tiles.  When officers executed on the warrant, Alexander fled from his home in a Dodge Journey.[2]  After leading officers on a 10-mile pursuit, Alexander was ultimately arrested.  Later that day, officers searched another vehicle, a Chevrolet Tahoe registered to Alexander.  It was parked in Los Angeles, 31 miles from Alexander's residence and 6.6 miles from McDaughtery's residence.  Inside the Tahoe was a backpack and duffel bag.  Inside those bags were, among other things, a cordless saw, a cordless drill, a crowbar, a screwdriver, a security uniform, baseball cap with "security" on it, black clothing, black boots, and black rubber gloves.

An amended information charged Alexander and McDaughtery with kidnapping to commit robbery (§ 209, subd. (b); count 1); second-degree robbery (§§ 211, 212.5, subd. (c); count 2); and assault with stun gun and taser (§ 244.5,

---

[2]        A Dodge Journey was the last vehicle Alexander rented from the company that rented him the minivan.  The Journey was never returned to the rental company.

3

subd. (b); count 3).  It further alleged Alexander suffered three prior serious felony convictions within the meaning of the three-strikes law (§ 667, subd. (a)(1)).

In 2014, Alexander moved to suppress evidence seized from the Tahoe. (Pen. Code, § 1538.5.)[3]  The trial court (Judge Michael Cassidy) denied the motion.

In 2018, Alexander filed a *Pitchess* motion for information of excessive force, bias, and prior instances of dishonesty by Deputy Christmann and Anaheim Police Detective Rodney Celello.  The trial court (Judge Julian Bailey) found good cause for an in-camera review of both records but ultimately found no discoverable information.

In 2021, Alexander and McDaughtery waived their right to a jury trial and were tried together.  The trial court (Judge Kimberly Menninger) found Alexander not guilty of kidnapping to commit robbery (count 1) but guilty of the lesser-included offense of false imprisonment (§§ 236–237, subd. (a)); guilty of second-degree robbery (count 2); and not guilty of assault with a stun gun or taser (count 3).  The court also found true the prior convictions alleged against him.  Alexander was sentenced to 12 years in state prison.

DISCUSSION

I.     Motion to Suppress

Alexander argues the search of the Tahoe violated his Fourth Amendment rights because the search warrant didn't cover that vehicle and there was no probable cause to believe evidence of criminal activity would be found in it.  We disagree on the second point.  As argued by the prosecution, there was probable cause to justify the search under the automobile exception to the warrant requirement.

At the outset of the hearing, the trial court ruled the search warrant did not extend to the Tahoe.  The warrant permitted officers to search vehicles "parked at or in the vicinity of" the two identified residences.  The court determined that the Tahoe,

---

[3]     All further statutory references are to the Penal Code unless otherwise indicated.

parked 6.6 miles from the closer residence, was too far away to be considered "in the vicinity." At that point, the prosecution had the burden to justify the warrantless search of the vehicle.

Deputy Christmann was the sole witness at the hearing. He testified that on January 10, 2013, he was helping to investigate a robbery at a check-cashing business in Thousand Oaks. In that robbery, the perpetrator, masked and wearing all black, fell through a hole in the ceiling shortly after the business opened, grabbed an employee, and stole money. A tarp, glove and cell phone were left at the scene. The deputy was "verbally told" that DNA records showed the phone was "positive to Mr. McDaughtery," with a "lower positive proof for the glove." A search warrant for the records of McDaughtery's phone revealed a series of calls to a number, made a few hours before the Thousand Oaks robbery. The second number was associated with "Jimmy Cagle." A "CII index search" for "Jimmy Cagle . . . came up as an aka for Mr. Alexander with a moniker of Kid." McDaughtery's phone had three numbers stored under the name "Kid." Information obtained from another search warrant showed that Alexander's phone was in the area of the Thousand Oaks robbery when it occurred. Both phones had been used near two other robberies, one on November 21, 2012, and the other on January 4, 2013, in Oxnard.

On April 9, 2013, a team conducting surveillance on Alexander at his Anaheim residence reported he was driving the Tahoe, parked it near his house, and went inside. That same day, Alexander drove the Tahoe to the Woodlawn address. According to Deputy Christmann, Alexander did not drive the Tahoe after parking it there.

On or before April 12, Deputy Christmann discovered a text between Alexander's and McDaughtery's phones with a link to a news article about the Anaheim robbery; the text was sent five days after the robbery. There were also texts about "saws, blades, and tarps."

5

From a review of the records for McDaughtery's phone, Deputy Christmann discovered McDaughtery had a second phone. The deputy reviewed texts between McDaughtery's second phone and the numbers he frequently texted. That in turn led to the discovery of a second phone number connected to Alexander. On April 12, wiretaps went "live" on the second phones of Alexander and McDaughtery. That same day, Deputy Christmann obtained the search warrant to search their residences and nearby vehicles.

From the wiretap surveillance, Deputy Christmann learned that the men talking on the second phones (presumably Alexander and McDaughtery) were discussing what the deputy believed to be an upcoming robbery. The deputy testified that on April 16 or 17 the men were talking about wind conditions and Alexander's payment to someone to either "cut the hole in the roof of a check cashing company or scout out a location that they were going to eventually hit." Later, the deputy clarified that there was no specific mention of cutting a hole in the roof or check cashing businesses being robbed. Alexander and McDaughtery didn't commit any robberies that night. According to the deputy, someone on the wiretap indicated, more or less, that "it is too windy tonight, we cannot do the job."

On April 18, the police executed on the search warrant for the residences and vehicles. At Alexander's residence, they found a key to the Tahoe. Deputy Christmann was hoping to find in the Tahoe "evidence related to their typical MO of breaking or forcing entry into these check cashing companies." But the Tahoe was not identified as being associated with the Thousand Oaks robbery. Deputy Christmann acknowledged that he had "[n]o specific information" that any property associated with the robberies would be inside the Tahoe. But he also testified that, in his experience, people "who commit robberies frequently use their vehicles to transport and secret the items stolen and the tools used in the course of the robbery." He later repeated: "[I]n my experience, based on long-term investigations of individuals who engage in this type of

6

criminal activity, that spans over a year and a half, then, yeah, I can say there is a very high likelihood that there would be evidence in their vehicles."

After the deputy's testimony, the trial court commented that there was "probable cause for the warrant to search the house. If this Tahoe was parked in the driveway, they would have probable cause to search the Tahoe." Defense counsel disagreed in part: "Based on the fact it is within the vicinity of the residence. But separate and independent of that, I don't believe there was probable cause to search the vehicle, and that's -- that's the point." The court denied the suppression motion. It reasoned that "based on the totality of circumstances" the evidence connected Alexander to "an ongoing conspiracy with regards to these robberies, which at one point involved him moving this vehicle that was registered to him, although it was a week before the search warrant was served."

"'In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment.'" (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 232.) We review the ruling for correctness, regardless of the reasoning behind it. (*People v. Session* (2023) 93 Cal.App.5th 723.)

"Warrantless searches 'are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' [Citation.]" (*People v. Castro* (2022) 86 Cal.App.5th 314, 319.) One such exception–the automobile exception–provides that "[w]hen the police have probable cause to believe an automobile contains contraband or evidence they may search the automobile and the containers within it without a warrant." (*People v. Superior Court (Nasmeh)* (2007) 151 Cal.App.4th 85, 100.) This exception applies to "vehicles the police stop on the highway and vehicles they find parked at the curb." (*People v. Dumas*

(1973) 9 Cal.3d 871, 883.) The search may be "'as thorough (as to location and type of container searched) as that which a magistrate could authorize by warrant[.]'" (*People v. Chavers* (1983) 33 Cal.3d 462, 466.)

"Probable cause is a 'strong suspicion' that what is being sought will be in the location to be searched." (*People v. Deutsch* (1996) 44 Cal.App.4th 1224, 1232.) "The connection between the items to be seized and the place to be searched need not rest on direct observation. It may be inferred from the type of crime involved, the nature of the item, and the normal inferences as to where a criminal might likely hide incriminating evidence." (*People v. Miller* (1978) 85 Cal.App.3d 194, 201.) And an officer may rely on training and experience to draw inferences from facts he or she observes, so long as those inferences are ""'grounded in objective facts and [ ] capable of rational explanation.'"" (*People v. Moore* (2021) 64 Cal.App.5th 291, 298.)

We conclude probable cause supported a warrantless search of the Tahoe under the automobile exception. Although the most recent robbery occurred two months before the search, the phone records supported the belief that Alexander and McDaughtery had previously robbed check cashing companies and that they were planning another robbery soon. (See *People v. Carrington* (2009) 47 Cal.4th 145, 163–164 [explaining probable cause may exist "when there is reason to believe that criminal activity is ongoing or that evidence of criminality remains on the premises"].) Given the nature of the suspected robberies, it was a reasonable inference that either Alexander or McDaughtery would have items such as black clothing and tools to cut through the roof and ceiling. And because such items are not inherently incriminating, it was reasonable to suspect the items would be found in their homes or vehicles. (See *U.S. v. Jacobs* (9th Cir. 1983) 715 F.2d 1343, 1346 [probable cause to believe clothing worn in robbery months earlier would remain at residence; clothes "were not unusual, nor incriminating in themselves"].) In short, the police could reasonably conclude that evidence of criminality would be found in the Tahoe.

8

In light of our conclusion, we need not consider the Attorney General's alternative argument that officers relied in good faith on the search warrant.

II.     *Pitchess* Review

As noted above, the court reviewed the files for Deputy Christmann and Detective Celello but found no discoverable information.  Alexander asks us to independently review the sealed transcript and materials to determine if any records were improperly withheld.  We have done so and conclude the record is not sufficiently clear to permit review of the court's decision.

Under *Pitchess*, a criminal defendant may move to discover law-enforcement personnel records relevant to his or her defense.  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1225 (*Mooc*).)  If the defendant has shown good cause for the discovery, the court must conduct an in-camera hearing to determine if any relevant records must be produced.  (*Id.* at p. 1226.)  At the hearing, the custodian of records must bring all documents "'potentially relevant'" to the motion for the court to review.  (*Id.* at pp. 1228–1229.)  "[I]f the custodian has any doubt whether a particular document is relevant, he or she should present it to the trial court.  Such practice is consistent with the premise of Evidence Code sections 1043 and 1045 that *the locus of decisionmaking is to be the trial court*, not the prosecution or the custodian of records."  (*Id.* at p. 1229, italics added.)  And "where the custodian of records does not produce the entire personnel file for the court's review, he or she must establish on the record what documents or category of documents were included in the complete personnel file.  In addition, if it is not readily apparent from the nature of the documents that they are nonresponsive or irrelevant to the discovery request, the custodian must explain his or her decision to withhold them."  (*People v. Guevara* (2007) 148 Cal.App.4th 62, 69 (*Guevara*).)

To "permit future appellate review," the trial court must make a record of the documents it examined.  (*Mooc*, *supra*, 26 Cal.4th at p. 1229.)  To make this record, the court can place copies of those documents in a confidential file, prepare a written list

9

of those documents, or "state for the record what documents it examined." (*Ibid.*) Without this record, "a party's ability to obtain appellate review of the trial court's decision, whether to disclose or not to disclose, would be nonexistent." (*Ibid.*)

We begin with Deputy Christmann's records. After the custodian of records for the Ventura Sheriff's Department was placed under oath, the court asked if the custodian had brought documents he "felt were in response to this motion." The custodian confirmed he had and produced two files "[b]ased on the timeline when this was filed." When the court asked whether he considered information "that existed but was outside of a time frame," the custodian stated he had not. The custodian confirmed that he brought all information the department had of allegations of dishonesty and excessive force by the officer. The court then asked, "what names did you give those files or the places that you search[ed]?" The custodian replied, "These are internal affairs documents." The court then inquired where such documents were kept, e.g. as part of a personnel file, in the chief's office, or elsewhere. The custodian answered, "They're kept separately independent of -- they're kept with the internal affairs documents." He testified about the general complaint process. When the court asked if "the things that you brought" were stored electronically, the custodian responded that "[t]here is a database that is used for the complaint process to store certain documents digitally but not the actual -- the whole file is here." The court reviewed the two files and determined they did not contain discoverable information. The two files were later submitted electronically and sealed for future review.

On this record, it is unclear what documents comprised Deputy Christmann's complete personnel file, what personnel files the custodian chose not to bring with him, and how he made that determination. (See *Guevara*, *supra*, 148 Cal.App.4th at p. 69 [custodian must establish what documents were not produced and why].) The custodian did not describe the categories of documents in the complete personnel file. He did not list any categories or documents he reviewed but decided not

10

to produce. Nor did he adequately explain the reasons for withholding any documents. Although there was some discussion of the timeline or timeframe of the document production, the court did not ask the custodian to state the specific date range for the search. The court impermissibly deferred the decision-making to the custodian when it accepted his representation that all responsive documents had been produced. We thus are unable to conduct any meaningful review on appeal.

We turn next to Detective Celello's records. The custodian of records for the Anaheim Police Department stated he brought three personnel files. He described the first as the "main personnel file" and another as the "internal affairs file." He stated the internal affairs file was empty, which indicated Detective Celello had not had any complaints within the last five years. According to the custodian, files older than five years would have been destroyed, but nothing in the files would indicate whether or not documents had been purged. The court expressed some concern about the empty file.[4] The court looked at the "personnel file information" and determined it was not discoverable. After prompting by the court reporter, the custodian of records was placed under oath and testified that everything he had stated previously was truthful. The court stated it was "troubling" that there may be information about the officer's dishonesty around the time of the investigation that led to the charges against Alexander. Nevertheless, the court found that the custodian was credible, and the court determined that "there's no material that's discoverable."

Again, on this record we cannot determine whether the custodian produced the entire personnel file for Detective Celello. The court did not ask whether the three files produced by the custodian comprised the entire file. In any event, the record reflects that the court reviewed, at most, two of the three files produced: the main personnel file and the empty internal affairs file. The record contains no description or discussion of

---

[4]    The in-camera review occurred in 2019; Alexander was initially charged in 2013.

11

the third file.  And unlike the review of Deputy Christmann's file, the court did not ask the custodian to submit under seal a copy of the documents he produced.

Accordingly, we conditionally reverse the judgment and remand for the trial court to conduct a new *Pitchess* hearing of both personnel files, where it must personally review the records or obtain a list of their contents and confirm the conclusion of the custodian of records.

## DISPOSITION

The judgment is conditionally reversed, and the matter is remanded to the court with directions to hold a new *Pitchess* hearing regarding Deputy Christmann's and Detective Celello's records.  If the court finds discoverable information, it shall determine whether Alexander was prejudiced from the denial of discovery.  If the court confirms the lack of discoverable evidence or finds Alexander was not prejudiced from the denial of discovery, the judgment shall be reinstated.  In all other respects, the judgment is affirmed.

DELANEY, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

MOTOIKE, J.

12