Filed 4/23/14

CERTIFIED FOR PARTIAL PUBLICATION[1]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW BRANDON PROCK,<br><br>    Defendant and Appellant. | 2d Crim. No. B239184<br>(Super. Ct. No. 1012288)<br>(Santa Barbara County) |

In 2000, Matthew Brandon Prock stabbed Eduardo Vasquez once in the chest, killing him. The jury at appellant's first trial acquitted him of first degree murder but convicted him of second degree murder. (Pen. Code, §§ 187, 189.)[2] We affirmed the conviction. (*People v. Prock* (May 22, 2002, B150248) [nonpub. op. by Yegan, J., Gilbert, P.J. and Perren, J. concurring].) The California Supreme Court denied review. In 2007, a federal district court granted appellant's petition for writ of habeas corpus and ordered a new trial after ruling that the trial court prejudicially erred when it instructed the jury that second-degree implied malice murder is a general intent crime. It also ruled that this court's analysis of harmless error was "perfunctory" and "objectively unreasonable." At the second trial in 2011, the jury again convicted appellant of second degree murder with the finding that he personally used a deadly weapon.

_____

[1] Pursuant to California Rules of Court, rules 976(b) and 976.1, the bracketed portions of this opinion are not certified for publication.

[2] All statutory references are to the Penal Code.

1

Appellant contends: 1. The prosecutor was collaterally estopped to argue this killing was premeditated and that the trial court erred when it permitted that argument. 2. The trial court erred when it gave instructions limiting his theories of perfect and imperfect self-defense and when it declined to instruct the jury on involuntary manslaughter and on a third theory of voluntary manslaughter. 3. The prosecutor committed misconduct in his closing arguments when he incorrectly defined the provocation required for heat of passion voluntary manslaughter, and 4. his Sixth Amendment confrontation rights were violated when a pathologist, who did not perform the autopsy, testified concerning the condition of Vasquez's body and the cause of his death. We affirm.

*Facts*

Eduardo Vasquez drove his car to the AM/PM market in Carpinteria at about 11:30 p.m. on the night of May 15, 2000. Three of Vasquez's friends were in the car with him: Justin Rosenberger, Mark Covarrubias, and Manuel Ortega. Vasquez parked the car next to the gas pump island, so that the driver's side of the car was close to a concrete post guarding the pump island. The four men got out of the car and were standing around it when appellant walked out of the AM/PM market. Instead of walking around the car, appellant walked between it and the concrete post. In doing so, he physically bumped Vasquez and Rosenberger.

As appellant walked away from the group, Vasquez said to him, "What's your problem? You have the whole gas station to walk through, you know." Vasquez and Rosenberger exchanged profanities with appellant. Appellant threatened to kill them and said: "I have guns and knives, I'll be back." No one threatened to harm appellant. Then, appellant walked quickly away.

Vasquez, Rosenberger and Covarrubias went inside the market to buy snacks and cigarettes. Ortega stayed outside, standing near the front bumper of Vasquez's car. A few minutes later, appellant reappeared in the parking lot. Covarrubias, who had just left the market, was surprised to see appellant approaching him. Appellant looked agitated and ready to fight. He was concealing something in his right hand but neither Ortega nor Covarrubias could tell what it was. Ortega told him, "No problems here." Appellant

2

replied, "Who's got the problem?" Covarrubias said he didn't want any problems. Appellant responded with something like, "Where's your friend? Your friend have a problem?" It seemed to Covarrubias like appellant was looking for Vasquez. Covarrubias told him, "You should probably go. Don't want any trouble."

At that point, Vasquez and Rosenberger came out of the market. Appellant was standing about 15 feet away from Vasquez. When Vasquez saw appellant, he tossed his hamburger to Ortega and said, "I'll handle this." Vasquez took a couple of steps toward appellant. He put his hands up near his face, with the palms out, as if to defend himself. He did not clench his fists. Appellant lunged forward and in an overhand and downward swinging motion, stabbed appellant in the chest. He immediately jumped back and moved 10 or 12 feet away from Vasquez and said, "What are you going to do now, punk?" Vasquez didn't reply. He looked at his friends and walked backwards a few steps. Vasquez's friends heard a woman say, "Matthew [appellant's first name], let's go." He got into the passenger seat of a white SUV and it drove off.

Vasquez told Rosenberger to take him to the hospital because he had been stabbed. He lost consciousness during the drive and was not responsive when they arrived at the hospital. He died as a result of the stab wound that penetrated six inches into his chest.

Appellant testified at the first trial. His testimony was read to the jury at his second trial. According to appellant, bumping into Vasquez and Rosenberger on his way out of the market was an accident. Vasquez immediately started yelling at appellant. "He was using profanity and the other three were yelling too. They joined in right behind him, came forward and started yelling at me too." Appellant left the parking lot as they yelled at him. Appellant was upset with himself because he had acted like a coward. He testified, "I wanted to go back and I wanted . . . to tell them, show them pretty much that I wasn't scared of them, that I wasn't a coward." He ran to his nearby apartment, retrieved a knife from his kitchen and then returned to the AM/PM parking lot.

Appellant testified that, when he got to the parking lot, he got to within 6 to 10 feet of Ortega and Covarrubias. He pulled the knife out of his pocket and said to them, " 'If

3

you've got a problem with me do something about it now.' " Appellant intended to scare them. He believed they would not try to beat him up if he was holding the knife, but he had no intention of using the knife. "Then about five, five, 10 seconds later, [Vasquez] came out of the store. Somebody came behind him too. When he came out of the store and saw me he came at me. He came pretty fast towards me in my direction and he handed . . . one of his friends something that was in his hand, and he did say, ' I'll handle this.' He just came at me. He came all the way up to me. And I remember that it happened really fast, because he came at me really fast. And I did take one step towards him, and I -- and I did stab with the knife, but it -- it kind of -- I turned my head and closed my eyes kind of when I did it and it felt like we kind of collided. And right as it happened, I turned and started to run from him . . . ." Appellant soon realized no one was following him, so he went back home.

On cross-examination, appellant agreed that he was the aggressor in his confrontation with Ortega and Covarrubias, but he denied asking them where their friend was. He also denied saying, during the first confrontation, that he would return with a gun and a knife to kill them. Appellant agreed that Vasquez and his friends did not have weapons in their hands and that no one hit him. No one threw anything at appellant. When he left the parking lot the first time, no one chased him.

Appellant explained, "I believe I did take a step when it happened, right as he ran into me, right as he came into me." Appellant denied that he intended to use the knife when he returned to the parking lot. However, he admitted that when Vasquez approached him, he "plunged" the knife into Vasquez's chest. "I didn't even thought [sic, think,] . . . it just happened really fast. He just ran up to me. I wasn't thinking, oh, I want to stab this guy in the chest. That's not what I was thinking." Appellant had the knife "in the ready position," and then stabbed Vasquez. "I wasn't aiming specifically for his chest or anything, just kind of did it. Closed my eyes . . . . We just kind of ran into each other. I didn't really even see where I had stabbed him or anything." Appellant believed that, if he had not had the knife, Vasquez would have "started beating me up."

4

*Jury Instructions*

The trial court instructed the jury on both express malice and implied malice second degree murder. In addition, the trial court instructed the jury on the lesser included offense of voluntary manslaughter on heat of passion and imperfect self-defense theories. The jury was also instructed on self-defense. No involuntary manslaughter instructions were given.

*Collateral Estoppel/Jeopardy*

Appellant contends the prosecutor, in his closing arguments, improperly urged the jury to convict appellant of second-degree murder on the theory that he planned or premeditated the killing. Because appellant was acquitted of first-degree murder in his first trial, appellant contends that jeopardy principles collaterally estopped the prosecutor from making that argument. Appellant forfeited appellate review of this issue by failing to raise it in the trial court. (*People v. Memro* (1995) 11 Cal.4th 786, 821 [if double jeopardy claim is not affirmatively raised in the trial court, "any claim on that ground is not preserved for review."]; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1185.)

On the merits, we conclude the prosecutor's arguments did not violate collateral estoppel principles because appellant's acquittal at the first trial was not a factual finding that he acted without planning or premeditation. Moreover, the jurors in appellant's second trial were never asked to decide whether the killing was premeditated. There was no relitigation of an issue necessarily decided in appellant's first trial.

The double jeopardy clause of the Fifth Amendment to the United States Constitution protects against a second prosecution for the same offense after an acquittal. (*North Carolina v. Pearce* (1969) 395 U.S. 711, 715.) Collateral estoppel is one component of double jeopardy. (*Ashe v. Swenson* (1970) 397 U.S. 436, 445-446.) As our Supreme Court has explained, "collateral estoppel bars relitigation of an issue decided at a previous trial 'if (1) the issue necessarily decided at the previous trial is identical to the one which is sought to be relitigated; if (2) the previous trial resulted in a final judgment on the merits; and if (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the prior trial.' ([*People v. Taylor* (1974) 12 Cal.3d 686], at p. 691.)" (*People v. Lawley* (2002) 27 Cal.4th 102, 163.) Appellant has the burden to establish the factual

5

predicate for application of the doctrine. (*People v. Morales, supra*, 112 Cal.App.4th at p. 1187.) Specifically, appellant must "demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding." (*Dowling v. United States* (1990) 493 U.S. 342, 350.)

Appellant focuses on several portions of the prosecutor's closing argument to support his contention that the prosecutor sought to relitigate the issue of whether he acted with premeditation and deliberation, requirements for a first degree murder conviction. At various times, while discussing the express malice form of second degree murder, the provocation required for voluntary manslaughter, and appellant's claim of imperfect self-defense, the prosecutor referenced the undisputed facts that appellant left the AM/PM market, retrieved a knife from his apartment, returned to the market, confronted the victim and stabbed him. The prosecutor argued these facts were sufficient to prove express or implied malice second degree murder, and that they foreclosed appellant's claims that he acted in the heat of passion or in imperfect self-defense.

Appellant contends these arguments invited the jury to convict him on the theory that he premeditated and deliberated the killing, a theory that, he contends, was foreclosed by his acquittal of first degree murder at the first trial. We disagree. The not guilty verdict at appellant's first trial shows only that the jury had a reasonable doubt as to his guilt on the degree of the murder. It does not amount to a factual finding that appellant did *not* premeditate or deliberate the killing. (*United States v. Watts* (1997) 519 U.S. 148, 155 [136 L.Ed.2d 554]; *Santamaria v. Horsley* (9th Cir. 1998) 133 F.3d 1242, 1246.) As the Supreme Court explained in *United States v. Watts, supra*, " 'acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt.' *United States v. One Assortment of 89 Firearms* (1984) 465 U.S. 354, 361 [79 L.Ed.2d 361]." (*United States v. Watts, supra*, 519 U.S. at p. 155.) Because "it is impossible to know exactly why a jury found a defendant not guilty on a certain charge[,]" the jury "cannot be said to have 'necessarily rejected' any facts when it returns a general verdict of not guilty." (*Id*.) Consequently, the jury in appellant's first trial cannot be said to have "necessarily decided" that he did not factually plan to kill Vasquez.

6

The prosecutor was not, therefore, collaterally estopped to argue that the evidence appellant returned to the AM/PM after retrieving the knife from his apartment was sufficient to prove he acted with express or implied malice and not in the heat of passion or in self-defense.

The second jury was correctly instructed on the express and implied malice forms of second-degree murder. It received no instructions on premeditated and deliberate first-degree murder and was never permitted to consider appellant's guilt of that offense. Among other things, it was informed that malice aforethought "is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time." In light of this instruction, the prosecutor properly argued that appellant's conduct before the stabbing was evidence that he acted with malice aforethought.

The prosecutor did not argue that appellant committed a premeditated murder. Instead, he argued that appellant acted with express or implied malice. For example, the prosecutor stated: "[At] the time that [appellant] walked back to the AM/PM and confronted Eddie Vasquez and drove a knife deep into his chest, he did so intending to take his life. Not necessarily intending to stab him only or intending to cause a problem, but intending to cause his death by that action. That is express malice, and if you find that he intended to kill him walking back to the AM/PM, then you have established malice aforethought in its express form."

The prosecutor made similar comments when discussing the provocation required for voluntary manslaughter and the concept of a cooling off period. For example, the prosecutor argued that the victim's conduct and that of his friends did not amount to provocation that would "require or cause a person of average disposition to do anything rash, never mind go home, grab a knife and kill somebody." He later reiterated, "The provocation has to be such that a person of average disposition would have been provoked. Defendant goes home, he gets a knife, and he returns. He's about five minutes away before he comes back, immediately goes up to the two men who are now outside . . . he displays the knife, he challenges them to a fight, makes it very clear he has the knife." When those two men do not respond, appellant encounters the victim. No blows are exchanged before

7

appellant stabs the victim. As the prosecutor argued, "Mr. Vasquez never made any contact whatsoever with [appellant]. [Appellant] wasn't injured in any way. He wasn't touched in any way. [Appellant] had the knife in his hand the entire time and this incident was over in seconds. [¶] Appellant came back to the AM/PM for purposes of killing someone, and that someone specifically was Eddie Vasquez. Provocation had nothing to do with it."

While addressing the concept of a cooling off period, the prosecutor stated, "Well first of all, [appellant] was never hot. He was angry but he wasn't hot in that response. In the time he got home, and as he says in his own testimony in 2001, he made the decision to get a knife before he actually went into his apartment. He wasn't reacting to this intense provocation that had occurred which robbed him of his ability to think clearly. He was thinking clearly."

The prosecutor rebutted appellant's imperfect self-defense theory of voluntary manslaughter by arguing that appellant did not actually believe he was in imminent danger of death or great bodily injury. "He put himself in that situation. He created the danger that he then found himself in and he never found himself in any danger. It never crossed his mind that anybody was going to hurt him. He was the one armed with a knife and he came there intending to inflict injury, not to receive injury. He didn't go there on a kamikaze mission believing that he was going to get hurt. That's why he had the knife." The prosecutor later repeated the argument: "Self-defense may not be claimed by a defendant who willfully and without any necessity for his own protection creates a danger with which he is thereupon threatened. Isn't that exactly what we have? He goes home, he gets a knife, he's angry, he's upset, and so he goes back to confront the people who he thinks insulted him. He's looking to [exact] revenge. It has nothing to do with that kind of emotional response to provocation. This is pure revenge." These arguments do not ask the jury to find that appellant premeditated or deliberated the killing. Rather, they use the undisputed facts of that night to argue that appellant acted with malice aforethought and to rebut his claims that he acted in the heat of passion or in imperfect self defense.

An acquittal on first degree murder alters the legal, but not factual, landscape for retrial purposes on lesser offenses. Here, for example, it seems apparent that appellant

went home to get a knife.  He was thinking about getting a knife before he picked it up and returned to confront the victim.  This is planning activity.  A prosecutor may argue "planning" to show murder in the first degree.  (See e.g. *People v. Anderson* (1968) 70 Cal.2d 15, 26.)  But such "planning" may also show express malice to prove second degree murder.

Appellant contends the trial court erred because it failed to give a sua sponte "preclusive" instruction forbidding the jury to base a guilty verdict "wholly or partially upon a finding that [appellant's] pre-homicide actions prove [appellant] then intended to kill and is therefore guilty of murder."  The trial court had no such obligation.  First, the proposed instruction is not a correct statement of the law.  Second, the jury was not required to ignore evidence that appellant acted with express malice in his "pre-homicide actions."

We also reject the contention that appellant received ineffective assistance from his trial counsel.  Counsel had no duty to object to the prosecutor's closing arguments or to request an instruction concerning the collateral estoppel effect of the verdict in appellant's first trial.  The collateral estoppel argument was incorrect for the reasons we have already stated.  Counsel was not ineffective for failing to raise an objection that lacked merit or to request an instruction that is an incorrect statement of the law.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 616.)

*[Instructions on Self-Defense*

The trial court instructed the jury on self-defense (CALCRIM No. 505), voluntary manslaughter on an imperfect self-defense theory (CALCRIM No. 571), and the impact of mutual combat on the right of self-defense.  (CALCRIM No. 3471.)  At the request of the prosecutor, the trial court also gave a special instruction, derived from California Jurisprudence Third, a legal encyclopedia, which stated "Self-defense may not be claimed by a defendant who willfully and without any necessity for his or her own protection creates a danger with which he or she is thereupon threatened."  (19 Cal.Jur.3d (2009) Criminal Law:  Defenses, § 54.)  Appellant contends the trial court erred because the mutual combat instruction was not supported by substantial evidence and because the special instruction misstated California law.  Neither contention is persuasive.

9

The trial court has a duty to instruct the jury, sua sponte, "on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case." (*People v. Carter* (2003) 30 Cal.4th 1166, 1219.) The instructions given must be supported by substantial evidence, e.g., evidence that is "sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) "It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) We review the instructions de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

*Mutual Combat*

CALCRIM No. 3471 describes the "mutual combat" exception to self defense: "A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if: [¶] 1. He actually and in good faith tries to stop fighting; [¶] [AND] [¶] 2. He indicates by word or by conduct to his opponent in a way that a reasonable person would understand that he wants to stop fighting and that he has stopped fighting; [¶] [AND] [¶] 3. He gives his opponent a chance to stop fighting. If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight. [¶] A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self defense arose. [¶] If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then defendant had the right to defend himself with deadly force and was not required to stop fighting."

This instruction is warranted where there is substantial evidence that each participant intended to engage in a fight before it began. (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1045.) " '[M]utual combat' consists of fighting by mutual intention or consent, as most clearly reflected in an express or implied agreement to fight. . . . [T]here must be evidence from which the jury could reasonably find that both combatants actually consented or intended to fight before the claimed occasion for self-defense arose." (*Id.* at pp. 1046-1047, emphasis removed.)

10

Appellant contends there was no substantial evidence that he and Vasquez mutually intended to fight because their final interaction was so fast, there was no time for them to reach an agreement on anything. This argument ignores the evidence of Vasquez's conduct before the stabbing. When Vasquez saw that appellant had returned, he tossed his food to Ortega and put his hands in the air, palms out, in a defensive posture. Appellant lunged forward and stabbed Vasquez. The moment when Vasquez and appellant faced each other before the stabbing, especially when considered in the context of their prior hostile encounter, is the substantial evidence that supports the trial court's mutual combat instruction. There was no error.

### *Creation of Danger*

Appellant contends the trial court misstated the law when it gave the special jury instruction that, "Self-defense may not be claimed by a defendant who willfully and without any necessity for his or her own protection creates a danger with which he or she is thereupon threatened." (19 Cal.Jur 3d, Criminal Law: Defenses, § 54.) He concedes that one of the pattern instructions given here, CALCRIM No. 3472, is a correct statement of the law and was properly given. That instruction provides, "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.) The special instruction was incorrect, appellant contends, because, unlike CALCRIM No. 3472, it removed "the essential fraud/fault concept and created a strict liability exception to perfect and imperfect self-defense: If you knowingly get yourself into a dangerous situation, you're responsible for whatever happens to you."

In our view, the special instruction is a correct statement of the law. As both parties note, it is based on two older Court of Appeal decisions, *People v. Albori* (1929) 97 Cal.App. 537, and *People v. Finali* (1916) 31 Cal.App. 479. These opinions, while not frequently cited, remain good law. Moreover, the instruction conveys the same concept as CALCRIM No. 3472, which appellant concedes is a correct statement of the law. Like the pattern instruction, this special instruction informs the jury that a defendant may not claim self-defense after creating the circumstances that necessitate his or her resort to violence.

11

Finally, any error in instructing the jury in terms of CALCRIM No. 3471 or the special "creation of danger" instruction was harmless because there is no reasonable probability that appellant would have obtained a different result had either instruction not been given. (*People v. Breverman* (1998) 19 Cal.4th 142, 178.) The trial court here instructed the jury with the pattern instructions concerning both perfect (CALCRIM No. 505) and imperfect self-defense. (CALCRIM 571.) It further instructed the jury that some of the instructions might not apply, "depending on your findings about the facts of the case. . . . After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (CALCRIM No. 200.)

The instructions at issue would have been irrelevant if the jury had found Vasquez and his friends threatened or attacked appellant as he claimed. For example, if the jury had found that Vasquez, rather than appellant, created the dangerous situation that caused appellant to use deadly force, it would have had no reason to apply the "creation of danger" instruction. The instruction, although a correct statement of the law, would not have been irrelevant. Similarly, if the jury had found, as appellant claimed, that Vasquez menacingly charged at appellant, leaving him no option but to thrust the knife into Vasquez's chest, CALCRIM No. 3471 would have been irrelevant and the jury would have disregarded it. Giving a factually irrelevant or "abstract" instruction that is otherwise correct in law is, in most cases " 'only a technical error which does not constitute ground for reversal.' (5 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Trial, § 2950, p. 3624.)" (*People v. Rowland* (1992) 4 Cal.4th 238, 282.)

*Manslaughter Instructions*

Appellant contends the trial court erred when it failed to instruct the jury on involuntary manslaughter on a "misdemeanor manslaughter" theory, an imperfect self defense theory and on the theory, accepted in *People v. Garcia* (2008) 162 Cal.App.4th 18, that the killing occurred during the commission of an inherently dangerous assaultive felony but without malice or an intent to kill.

## Misdemeanor Manslaughter

In appellant's first appeal, we concluded the trial court erred when it failed to instruct the jury on misdemeanor manslaughter. The error was, however, harmless because, when it found appellant guilty of second degree murder, the jury expressly rejected appellant's claim that he displayed the knife without intending to kill Vasquez and without a subjective understanding that stabbing Vasquez could result in his death. In addressing a separate harmless error issue, the United States District Court adopted the opinion prepared by the magistrate judge, that appellant's "brandishing" claim, while implausible, "had enough support in the videotape evidence to permit the argument that Vasquez actually rushed [appellant] and impaled himself on the knife . . . .If believed, this evidence would tend to show that [appellant] was not the aggressor and did not harbor the requisite specific intent for second-degree murder."

The trial court at appellant's second trial declined to instruct the jury on misdemeanor manslaughter. Appellant contends there was substantial evidence at the second trial from which a reasonable jury could have found that the killing occurred while he committed the misdemeanor of brandishing the knife. (§ 417.) Consequently, he contends the trial court prejudicially erred when it failed to instruct the jury on that theory. We disagree.

The misdemeanor of brandishing is committed when a person draws or exhibits a deadly weapon, in the presence of another person, "in a rude, angry, or threatening manner . . . ." (§ 417.) "A killing without malice 'in the commission of an unlawful act, not amounting to [a] felony' is involuntary manslaughter. (§ 192, subd. (b).)" (*People v. Thomas* (2012) 53 Cal.4th 771, 814.) "Generally, involuntary manslaughter is a lesser offense included within the offense of murder. [Citation.] Due process requires that the jury be instructed on a lesser included offense *only* when the evidence warrants such an instruction." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

The evidence at appellant's second trial did not support a misdemeanor manslaughter instruction on a brandishing theory. Rosenberger testified that he could see something shiny that was partially concealed by appellant's hand. He could not tell that it was a knife until appellant lunged forward toward Vasquez. Covarrubias testified that he

13

could see appellant was holding something in his right hand that he was trying to conceal. Covarrubias realized the object was a knife only when he saw the stabbing.. Ortega's testimony was similar. He testified that, when appellant returned to the market, he seemed to be hiding something in his right hand. Ortega could not see what it was and appellant kept the object concealed the whole time. He was about to warn Vasquez that appellant had something in his hand when appellant lunged forward and struck Vasquez in the chest. Ortega did not realize appellant had used a knife until the incident was over and Vasquez told Ortega he'd been stabbed.

The jury also heard appellant's testimony from the first trial. Appellant testified that he returned to the AM/PM intending to scare the other men by showing them the knife. He did not intend to harm anyone with the knife. When he was about 10 feet away from Covarrubias and Ortega, appellant pulled the knife out of his pocket and challenged them by saying, "If you've got a problem with me do something about it now." Five or ten seconds later, Vasquez came out of the market and saw appellant. Appellant testified, "[H]e came at me. He came pretty fast towards me in my direction, and . . . he did say, 'I'll handle this.' He just came at me . . . . And I remember that it happened really fast, because he came at me really fast. And I did take one step towards him, and I -- and I did stab with the knife, but it -- it kind of -- I turned my head and closed my eyes and kind of when I did it and it felt like we kind of collided." On cross-examination, the prosecutor asked appellant, "So you did take a step forward with the knife in the ready position and stabbed [Vasquez] in the chest?" Appellant answered, "Yes."

Brandishing occurs when a person "in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or . . . in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel . . . ." (§ 417.) Rosenberger, Covarrubias and Ortega each testified that appellant concealed the knife until the moment he plunged it into Vasquez's chest. Nothing in their testimony supports a finding that appellant brandished the knife. Appellant did say that he pulled the knife out of his pocket but did not say he displayed the knife in a threatening manner.

14

Appellant's testimony, if credited, supports a finding that he brandished the knife toward Covarrubias and Ortega, but it does not support a finding that brandished the knife toward Vasquez. Appellant did not describe himself drawing or exhibiting the knife to Vasquez. Appellant testified that, while he was holding the knife, Vasquez ran up to him very fast. Appellant took a step in Vasquez's direction and stabbed at him. Appellant's admitted conduct in moving toward Vasquez and stabbing at him precludes the claim that he did nothing more than brandish the knife at Vasquez. (*People v. Gutierrez, supra*, 28 Cal.4th at p. 1145 [evidence did not support misdemeanor manslaughter instruction on a brandishing theory where defendant admitted he fired gun at victim].)

We are, of course, aware that we concluded, in the first appeal, the trial court's failure to give a misdemeanor manslaughter instruction was harmless error. That conclusion was based on the record in the first trial. The evidence at appellant's second trial was more detailed, especially as it related to appellant's handling of the knife in the moments immediately before the stabbing. Rosenberger, Covarrubias and Ortega testified at the second trial, more clearly than at the first, that they could not see the knife until after appellant stabbed Vasquez. Moreover, on further review we conclude appellant's own testimony that he stepped forward, toward Vasquez, while stabbing at him with the knife, forecloses the claim that he only brandished the knife.

### *Involuntary Manslaughter on an Imperfect Self-Defense Theory*

The mental state required for involuntary manslaughter is criminal negligence. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007.) Criminal negligence exists when the defendant's conduct is " ' "aggravated, culpable, gross, or reckless" ' i.e., conduct that is ' "such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or in other words, a disregard of human life or an indifference to consequences." ' " (*Id.*, quoting *People v. Penny* (1955) 44 Cal.2d 861, 879.) This is an objective, rather than a subjective standard. "Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. [Citation.] In

15

contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk." (*People v. Butler, supra*, 187 Cal.App.4th at p. 1008.)

Appellant contends the jury could have found that he committed involuntary manslaughter by acting in a criminally negligent manner and unintentionally stabbing Vasquez in unreasonable self-defense. We disagree. There was no substantial evidence to support an instruction on this form of involuntary manslaughter. Rosenberger, Covarrubias and Ortega each testified that appellant approached Vasquez and stabbed him in the chest. Appellant testified that, as Vasquez came toward him, he took one step toward Vasquez and stabbed at him with the knife. At a minimum, the evidence showed that appellant acted with conscious disregard for life when he intentionally moved toward Vasquez while stabbing at him with the knife. The trial court did not err when it refused to instruct on imperfect self defense involuntary manslaughter.

### *Harmless Error*

Even if the evidence in this trial was minimally sufficient to support involuntary manslaughter instructions, the trial court's omission of these instructions was harmless because it is not reasonably probable that appellant would have received a result more favorable had the instructions been given. (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) The jury here was instructed on second degree murder, imperfect self-defense voluntary manslaughter, and heat-of-passion voluntary manslaughter. Each of these offenses requires a higher degree of culpability than does the offense of involuntary manslaughter. As a consequence, the fact that the jury rejected voluntary manslaughter and found appellant guilty of second degree murder "precludes any possible error in the refusal to instruct on involuntary manslaughter." (*People v. Guiterrez, supra,* 28 Cal.4th at p. 1145; see also *People v. Rogers* (2006) 39 Cal.4th 826, 884; *People v. Mincey* (1992) 2 Cal.4th 408, 438-439.)

### *Manslaughter/People v. Garcia*

In *People v. Garcia* (2008) 162 Cal.App.4th 18, the court of appeal held "an unlawful killing during the commission of an inherently dangerous felony, even if unintentional, is at least voluntary manslaughter." (*Id.* at p. 31.) Appellant contends the

16

jury should have been instructed on this theory. We disagree because the theory was recently rejected by the California Supreme Court. In *People v. Bryant* (2013) 56 Cal.4th 959, our Supreme Court disapproved *Garcia, supra,* and held, "A defendant who has killed without malice in the commission of an inherently dangerous assaultive felony must have killed without either an intent to kill or a conscious disregard for life. Such a killing cannot be voluntary manslaughter because voluntary manslaughter requires either an intent to kill or a conscious disregard for life." (*Id.*) Consistent with *Bryant, supra,* we conclude the trial court did not err when it declined to instruct the jury on the *People v. Garcia* theory of voluntary manslaughter.

*Prosecutorial Misconduct*

Appellant contends the prosecutor committed prejudicial misconduct by arguing that the provocation required for voluntary manslaughter is a provocation that would cause a reasonable person to kill. He further contends the trial court erred when it overruled defense counsel's objections to that argument. We conclude the prosecutor's comments did not amount to misconduct. Consequently, no error occurred.

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' ( *People v. Morales* (2001) 25 Cal.4th 34, 44; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 . . .; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 . . . .)" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.) The misconduct must be significant enough to "result in a denial of the defendant's right to a fair trial." (*United States v. Agurs* (1976) 427 U.S. 97, 108.) Prosecutorial misconduct "that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' (*People v. Strickland* (1974) 11 Cal.3d 946, 955 . . . ; accord *People v. Farnam* (2002) 28 Cal.4th 107, 167.)" (*People v. Cole, supra,* 33 Cal.4th at p. 1202.)

In evaluating the contention that a prosecutor's argument to the jury constituted misconduct, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."

17

(*People v. Berry man* (1993) 6 Cal.4th 1048, 1072, overruled on another point in *People v. Hill* (1998) 17 Cal.4th 800, 822-823.) A prosecutor has "wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) Misconduct is not demonstrated by isolated words and phrases. Instead, we view the prosecutor's statements in the context of the argument as a whole. (*Id.*)

Here, appellant contends the prosecutor committed misconduct in his closing arguments because he inaccurately defined the provocation required to reduce a killing from murder to voluntary manslaughter. "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' (*People v. Barton* (1995) 12 Cal.4th 186, 201 . . . .)" (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted.)

Provocation has both an objective and a subjective component. The subjective component requires proof that the defendant killed while actually under the influence of a strong passion induced by sufficient provocation. (*People v. Moye* (2009) 47 Cal.4th 537, 550.) The objective component requires proof that the victim's physical or verbal conduct "be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Id.*) It is not necessary to show that a person of average disposition would react to the provocation by killing. "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection . . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*People v. Beltran, supra,* 56 Cal.4th at p. 949.)

Appellant contends the prosecutor misrepresented the objective aspect of provocation to the jury. After reading the prosecutor's closing arguments in their totality, however, we are convinced no misconduct occurred. At various points in his argument, the prosecutor invited jurors to consider whether a person of average disposition would have been provoked enough by the victim's conduct to have killed or stabbed Vasquez. As the court held in *Beltran*, however, this was the wrong question. But the prosecutor was also careful to remind jurors of the correct question. He referred them to their instructions, which were correct, and reminded the jurors that they had to determine whether a person of average disposition would have been provoked to act rashly in response to the provocation shown by the evidence. Considering the argument as a whole, we conclude there is no reasonable probability the jury understood or applied the prosecutor's comments in an improper or erroneous manner. (*People v. Wilson* (2005) 36 Cal.4th 309, 337.)

*Confrontation*

Dr. George Sturbenz conducted the autopsy of Vasquez and prepared a report of his findings. The report included photographs taken by a staff member of the Sheriff's Department. Dr. Sturbenz testified at appellant's first trial. By the time of the second trial, Dr. Sturbenz had moved to Ohio and Dr. Robert Anthony had become the coroner of Santa Barbara County. Dr. Anthony testified as an expert witness at the second trial, offering his opinions concerning the physical condition of Vasquez's body, the nature of the wounds he received and the cause of his death. In arriving at his opinions, Dr. Anthony reviewed Sturbenz's autopsy report and the photographs included with it. The report itself was not entered into evidence. The photographs were authenticated by a deputy coroner who was present for the original autopsy.

Appellant contends his Sixth Amendment confrontation right was violated when the trial court permitted Dr. Anthony to testify concerning the report prepared by Dr. Sturbez. Our Supreme Court rejected this contention in *People v. Dungo* (2012) 55 Cal.4th 608. There, a pathologist gave his opinion concerning the cause of a murder victim's death based on an autopsy report and photographs prepared by a pathologist who did not testify. Our Supreme Court held this arrangement did not violate the defendant's Sixth Amendment

19

confrontation rights because the objective facts included in the autopsy report concerning the condition of the victim's body "were not so formal and solemn as to be considered testimonial  for purposes of the Sixth Amendment's confrontation right, and criminal investigation was not the primary purpose for recording the facts in question."  (*Id.* at p. 621.)  the same result obtains here.  The trial court did not err in admitting Dr. Anthony's testimony.

*Cumulative Testimony*

Appellant contends the cumulative effect of these errors rendered his trial fundamentally unfair.  We reject this contention because there was no error to cumulate.]

*Response to Federal Opinion*

As indicated, the United States District Court for the Central District of California adopted the Report and Recommendation of a United States Magistrate Judge (hereafter, the "federal opinion") granting appellant's petition for writ of habeas corpus.  It vacated appellant's conviction because our harmless error analysis in the first appeal was "perfunctory" and "objectively unreasonable."  We have an obligation to respond to the federal opinion.  The comments made by Division Two nearly 40 years ago in *People v. Miller* (1978) 85 Cal.App.3d  194 are apt.  There, when confronted with a federal trial court order to show cause on a habeas petition, the court said, "We consider the order of the federal district court to be an affront to the judges of this state."  (*Id.* at p. 198.)

The present matter is worse.  Here, there is a full opinion condemning the harmless error analysis as "perfunctory" and "objectively unreasonable."  The former statement is, at the very least, disrespectful, and raises the issue of integrity.  The Court of Appeal has a " 'bounden duty to protect the integrity of the court.' (Citations.)  'However willing [the individual judge or justice] may be to forego the private injury to reputation, the obligation is upon him by his oath to maintain the respect due to the court.' "  (*In re Ciraolo* (1969) 70 Cal.2d 389, 394-395; see also *In re Buckley* (1973) 10 Cal.3d 237, 249.)  We understand that the federal courts have the power and right to vacate state court final judgments.  Having the power and right does not make it right.

The California Court of Appeal is tasked with many duties.  One of them is to follow our State's constitutional mandate to reverse a judgment if a miscarriage of justice has occurred.  (Cal. Const., art. VI, § 13.)  Any harmless error analysis involves both a legal and a factual appraisal.  To some extent, the Court of Appeal is called upon to weigh the facts in deciding whether a conviction should be reversed.  Such a factual determination of that question is apparently entitled to no weight in the central district.  The federal opinion cited cases stating that the standard of review in a habeas case is "highly deferential" and requires that a state court decision be "given the benefit of the doubt."  (*Lindh v. Murphy* (1997) 521 U.S. 320, 336; 138 L.Ed2d 481; *Woodford v. Visciotti* (2002) 537 U.S. 19, 24, 154 L.Ed.2d 27.)  It does neither.

The original opinion stated that the trial court should not have instructed the jury that second degree murder is a general intent crime.  It stated this error was harmless beyond a reasonable doubt, citing *Chapman v. California* (1967) 386 U.S. 18, as well as two controlling California Supreme Court and one California Court of Appeal opinion, to support our legal and factual determination that any deficiency in the trial court's instructions to the jury was harmless.  (*People v. Swain* (1996) 12 Cal.4th 595, 601-603; *People v. Nieto-Benitez* (1992) 4 Cal.4th 91 102-103; *People v. Lyons* (1991) 235 Cal.App.3d 1456, 1462.)

In reaching this ruling, the original opinion did not denigrate the instructional phase of a trial.  It seemed obvious, however, that in this fact specific case, no amount of jury instruction would change the basic facts or alter their legal significance.  After the initial confrontation, appellant announced he would be back to kill the victim and his companions with guns or knives.  He went home, armed himself with a knife, and returned.  He confronted the victim's companions.  The victim came out of the store.  Consistent with appellant's earlier announced intention of killing someone, he fatally stabbed the unarmed victim in the chest.  This sounds like murder.  The objective reader will make up  his or her own mind.  Given these stark facts, the trial court's single and erroneous use of the legal term of art, "general criminal intent," could not have adversely affected the jury's

21

deliberations or verdict. Thus, the original opinion concluded the instructional error was harmless beyond a reasonable doubt.

To grant the writ of habeas corpus, by contrast, the federal opinion had to adopt a factual premise that even it characterized as "implausible." Adopting one version of the defense theory at trial, the federal opinion concluded it was possible the victim "inflicted the mortal wound on himself as he charged Petitioner, who was holding the knife in his outstretched arm." Based on the totality of facts and circumstances, and the reasonable inferences that can be drawn from them, we would go even farther. The defense theory was not just "implausible," it was preposterous. This scenario would not even work if the victim was Jesse Owens reincarnate, sprinting toward appellant with his chest jutting out, so that a stationary kitchen knife could penetrate six inches into his thoracic cavity and heart.

The implausibility of the defense theory lead us to the original and terse harmless error analysis. In theory, any legal analysis by any court could be longer. Here it was unnecessary. The original opinion's treatment of appellant's contentions was not "perfunctory." This word is defined as: "done or acting routinely and with little interest or care." (American Heritage Dict. (2d college ed. 1982) p. 922.) The original opinion was not routinely written with little interest or care.

Apart from the "bounden duty to protect [and defend] the integrity of the court," (*In re Ciraolo, supra,* 70 Cal.2d 389) there is another reason why this response is appropriate. The questioned harmless error analysis is not an aberration in the Second Appellate District. It is a typical analysis and thus, the issue transcends the present matter. If the former harmless error analysis was faulty, other similar analyses from our court are also vulnerable to successful collateral attack in the central district. We hope that is not the case

Finally we disagree with the federal opinion's conclusion that the harmless error analysis was "objectively unreasonable." Based upon the facts, circumstances, and the reasonable inferences which flow therefrom, the objective reader will make up his or her own mind. Nothing in *Ho v. Carey* (9th Cir. 2003) 332 F.3d 587 or *Inthavong v. Lamarque* (9th Cir. 2005) 420 F.3d 1055, 1059 compelled the grant of habeas relief and the vacation of the original murder conviction. To the extent that these cases stand for the proposition

that habeas relief is required as a matter of law, they work as a judicial repeal of the Antiterrorism and Effective Death Penalty Act of l996. "This situation is a good example of why the criminal justice system is so often criticized for failing to achieve certainly and finality in its judgments." (*People v. Miller, supra*, 85 Cal.App.3d at p. 199.) Appellant was fairly tried and fairly convicted; both times.

*Conclusion*

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION.*

YEGAN, J.

We concur:

GILBERT, P.J.

PERREN, J.

23

Frank J. Ochoa, Judge

Superior Court County of Santa Barbara

_____

Stephen Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Pamela C. Hamanaka, Deputy Attorney General, for Plaintiff and Respondent.